**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **NATIONAL PARKS CONSERVATION** | ) |
| **ASSOCIATION** | ) |
| 777 6th Street, NW | ) |
| Suite 700 | ) |
| Washington, D.C. 20001-3723 | ) |
| | ) |
| and | ) |
| | ) |
| **GREATER YELLOWSTONE COALITION** | ) |
| 215 South Wallace Avenue | ) |
| Bozeman, MT 59715 | ) |
| | ) |
|      Plaintiffs, | ) |
| | ) |
| **v.** | ) |
| | )   Civil Case No. _____ |
| **U.S. DEPARTMENT OF THE INTERIOR** | ) |
| 1849 C Street, NW | ) |
| Washington, D.C. 20240 | ) |
| | ) |
| and | ) |
| | ) |
| **NATIONAL PARK SERVICE** | ) |
| U.S. Department of the Interior | ) |
| 1849 C Street, NW | ) |
| Washington, D.C. 20240 | ) |

_____)

## COMPLAINT

### INTRODUCTION

1.     Grand Teton National Park ("Grand Teton" or the "Park") is one of the jewels of

the National Park System.  Approximately 2,800,000 people visit the Park each year to

experience its mountains and lakes and to watch its abundant wildlife.  Elk, moose, bison,

beaver, mule deer, grizzly bears and wolves are only some of the iconic wildlife that live in or

migrate through the Park.  Federal law generally protects the wildlife.  But some 2300 acres within the Park are owned privately or by the State of Wyoming, known as "inholdings."  For 65 years, Defendants National Park Service ("NPS") and the Department of the Interior applied federal law to protect wildlife on those inholdings, and for almost all of that time, the State of Wyoming accepted that law as controlling.  However, NPS has now concluded that its wildlife protection regulations do not apply on the inholdings; turned over to the Wyoming Game and Fish Department ("WGFD") all regulatory authority over killing wildlife on such inholdings; and agreed with WGFD's actions making wildlife which wander onto inholdings subject to hunting or other harm inconsistent with NPS's statutory mandate of protecting the Park's wildlife.

2.      As a result, iconic park species such as bison, grizzly bears and gray wolves, for example, are now or could be soon subjected to shooting on Park inholdings under Wyoming law.  The bison is so emblematic of the parks that its image appears on the official NPS arrowhead insignia.  Yet NPS now considers WGFD regulations to apply which permit bison to be shot on Park inholdings, and as a result hunters have in fact killed bison there.  Wyoming law designates wolves and grizzly bears as "trophy game" animals in the Park, permitting WGFD to subject them to hunting or other killings there but for their current protection under the Endangered Species Act.  However, on March 3, 2016, the U.S. Fish and Wildlife Service proposed a regulation which would remove grizzly bears in the Greater Yellowstone Area from that protected status.  And the U.S. House of Representatives passed a bill on February 26, 2016 which would remove that protection as to wolves in Wyoming.  If either of those species is no longer protected by that Act, the State of Wyoming could allow them to be killed on Park inholdings.

73681918v4

2.      NPS's abdication of its responsibility and authority to control or prevent the killing of Park wildlife on inholdings was contrary to law because federal law prohibiting anyone from harming Park wildlife does apply on inholdings in Grand Teton.  Furthermore, in determining incorrectly that federal law does not apply, NPS acted arbitrarily and capriciously, including by failing to consider all relevant facts.

3.      Plaintiffs National Parks Conservation Association ("NPCA") and Greater Yellowstone Coalition ("GYC") ask for the Court to grant declaratory and other relief against these unlawful and arbitrary and capricious actions by Defendants.

## THE PARTIES

4.      Defendant NPS is the agency of the United States Government charged by Congress with responsibility for the "supervision, management and control" of the units of the National Park System.  *See* National Park Service Organic Act of 1916, Public Law 64-408, § 2, 35 Stat. 535 (1916), 54 U.S.C. § 100302(a)(3).  NPS is part of the United States Department of the Interior.

5.      Defendant United States Department of the Interior is the cabinet-level agency in the U.S. Government that includes NPS.

6.      Plaintiff NPCA is a national organization devoted to the protection and preservation of the National Park System.  NPCA has approximately one million members and supporters in Wyoming and throughout the nation who hike, camp, watch wildlife and engage in other recreational activities in the National Parks.

7.       Plaintiff GYC is a national organization devoted to conserving the 20 million acre Greater Yellowstone Ecosystem.  The Greater Yellowstone Coalition engages in education

73681918v4

and advocacy to protect wildlife and the ecosystem of Yellowstone National Park and the area
surrounding Yellowstone, including Grand Teton.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331
(federal question).  Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C.
§ 706.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because
Defendants NPS and the Department of the Interior have their headquarters in this District and
Plaintiff National Parks Conservation Association is headquartered in this District.

## PLAINTIFFS' STANDING

10.     Plaintiffs have a long-standing interest in the protection and preservation of Grand
Teton and of its wildlife, which is an essential part of their respective organizational missions.
Plaintiffs have long worked in many ways to protect the Park's wildlife by advocacy, educational
work and scientific analysis.

11.     Plaintiffs' members use Grand Teton for recreational and educational purposes
and for aesthetic enjoyment.  Plaintiffs' members have viewed and enjoyed the Park's wildlife
and have concrete plans to do so on an ongoing basis.  NPS's decisions at issue here constitute a
direct and concrete injury to the aesthetic, conservation, recreational, scientific and educational
interests of Plaintiffs and Plaintiffs' members that are traceable to NPS's actions and would be
redressed by the relief requested by Plaintiffs.

12.     Franz Camenzind is one such NPCA member.  He resides in Jackson, Wyoming,
a few miles from the Park.  He is a member of NPCA's Northern Rockies Regional Council.  He
visits Grand Teton regularly on a weekly basis and intends to continue to do so.  He enjoys

hiking, snowshoeing and kayaking there.  Observing and photographing wildlife there is an important part of his enjoyment of the Park.  He has a Ph.D. in zoology, and his doctoral dissertation focused on the behavior and ecology of free-ranging coyotes in Grand Teton and the National Elk Refuge adjacent to the Park.  He has worked as a consultant on environmental assessments and environmental impact statements for projects at Grand Teton.  He has also worked as a professional wildlife photographer and producer of wildlife films at Grand Teton, among other places, featuring wolves, grizzly bears and pronghorn antelope.  If hunting and other taking of wildlife on inholdings is permitted, that would impair his enjoyment and appreciation of the Park.  The places in the Park that he frequently visits are near some of the inholdings at issue here and easily within gunshot hearing range from those inholdings.

13.     Another NPCA member is Peter M. Jorgensen, who has lived in and around Grand Teton for over 60 years.  He is a member of NPCA's Northern Rockies Regional Council. He currently lives about six miles from the Park and regularly visits it at least twice each week throughout the year, and he intends to continue to do so.  He goes hiking and often takes photographs of wildlife in the Park.  He worked as an engineer and land surveyor in the area of the Park for many years, including on projects relating to land with the Park's boundaries, including the Moosehead Ranch inholding and areas in Kelly and around Antelope Flats, where other inholdings lie, so he is intimately familiar with those areas, all of which are at issue here. He has breakfast regularly at a restaurant in Moose, Wyoming, within the Park boundaries and near other inholdings at issue here.  His ability to enjoy the Park's wildlife ranks high as a reason for his enjoyment of the Park.  He particularly enjoys observing the moose, deer, elk, bison and coyotes.  A number of years ago, he witnessed a coyote being shot near Pinto Ranch, one of the inholdings at issue here.  That was an extremely jarring and disturbing experience for Mr.

Jorgensen.  If killing of wildlife within the Park were permitted on inholdings, that would have a significant detrimental effect on the very character of the Park and would significantly detract from Mr. Jorgensen's appreciation and enjoyment of the Park.

14.      Another NPCA member is Andrew Salter.  He serves on NPCA's Northern Rockies Regional Council.  He lives in Jackson, Wyoming a few miles from the Park.  He visits Grand Teton approximately once or twice a week throughout the year, and intends to continue to do so in the future.  He regularly hikes in the Park, enjoys biking, including in and around Kelly, Antelope Flats, Jenny Lake and Moose, and cross-country skis around Moose and other areas of the Park.  The wildlife in the Park is an important focus of his enjoyment of the Park.  That enjoyment is shaped in important ways by his knowledge that, with the limited exception of the Joint Elk Reduction Program, the Park is free from hunting.  He enjoys seeing a range of species, including moose, elk, pronghorn, deer, brown bears, and grizzly bears, and has a particular interest in wolves.  If hunting were permitted on inholdings within the Park, that would be extremely upsetting to Mr. Salter and would impair his enjoyment and appreciation of the Park.

15.      Edgar D. Jannotta, Jr. is a member of GYC and is on its Board of Directors and Executive Committee.  He lives less than one mile from Grand Teton.  He visits the Park regularly, on average two or three times a month, throughout the year, and he intends to continue to do so.  He goes hiking and back country skiing and enjoys floating on the Snake River, rafting or stand-up paddling, generally south of Jackson Lake.  He also co-owns a boat and regularly goes boating on Jackson Lake.  When in the Park, he is always on the lookout for wildlife, and the prospect of seeing animals moving freely in their natural habitats is exciting to Mr. Jannotta and part of what draws him to the Park.  He enjoys viewing many species, including on the shore as he floats on the Snake River.  While he is aware of the Joint Elk Reduction Program, his

73681918v4

appreciation and enjoyment of the Park is enhanced  by the knowledge that the Park is otherwise free from hunting and is a safe sanctuary for wildlife.  He would view it negatively if hunting and other taking of wildlife were permitted within the Park boundaries.  If he were to hear shots while using the Park, he would not want to stay in the Park.

16.     Patrick Dominick is another member of GYC.  He has visited the Park regularly for over thirty years and has lived in Jackson, Wyoming for more than two years.  He now lives in a home less than a mile from the southern entrance of the Park.  Mr. Dominick drives through the Park on almost a daily basis and visits on average about twice a month throughout the year to bike, hike, mountain climb, camp, swim, kayak, and cross-country ski.  He intends to continue to visit the Park regularly in the future.  Viewing wildlife is a major reason why Mr. Dominick enjoys the Park and has chosen to live in close proximity to the Park.  Mr. Dominick chose the location of his home specifically because it is located on a migration corridor for bison, elk and pronghorn, and maximizes his opportunities to view wildlife undisturbed.  It is important to Mr. Dominick's enjoyment and appreciation of the Park that, with the limited exception of the Joint Elk Reduction Program, hunting and the taking of wildlife is not permitted within the outer boundaries of the Park.  If hunting and the taking of wildlife were permitted on inholdings, that would change the very complexion of the Park for Mr. Dominick and would detract from his enjoyment and appreciation of the Park.

## LEGAL FRAMEWORK

17.     Congress created NPS and entrusted it with the management of the National Park System.  *See* 54 U.S.C. §§ 100101, 100301, 100302.  Congress established high standards for administering these special places, requiring NPS to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the

System units, <u>which purpose is to conserve</u> the scenery and the natural and historic objects, and <u>the wild life in the System units,</u> and to provide for the enjoyment of the scenery, historic objects and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a).

18.     In 1950, Congress adopted what is now the statute governing Grand Teton (the "Grand Teton Enabling Act"), repealing an earlier more-limited version.  *See* 16 U.S.C. § 406d. Congress mandated that Grand Teton be managed as a unit of the National Park System under the NPS Organic Act.  16 U.S.C. § 406d-1.  In the Grand Teton Enabling Act, Congress provided that the State of Wyoming and the Department of the Interior were to develop an annual program for the "controlled reduction of elk" inside the Park by hunters licensed by WGFD and made temporary rangers by NPS (the "Joint Elk Reduction Program").  16 U.S.C. § 673c.  That Joint Elk Reduction Program is subject to approval by the Governor of Wyoming and the Secretary of the Interior.  *Id.*  However, other than pursuant to that Program, the Act did not allow any hunting in the Park.  As the Secretary of the Interior stated to the Wyoming authorities days after passage of the Grand Teton Enabling Act, other than under that Program, no hunting is allowed "of any animal species at any time or place within the boundaries."  October 4, 1950 letter from Secretary of the Interior Oscar Chapman, Ex. C hereto.

19.     The NPS Organic Act authorized the NPS to adopt regulations as "necessary or proper for the use and management" of the National Park System.  54 U.S.C. § 100751(a).  NPS regulations thereunder are contained at 36 C.F.R. §§ 1-50.  Section 1.2 governs the scope of application of the regulations in Chapter 2.  Section 1.2(a) provides that "the regulations contained in this chapter apply to all persons entering, using, visiting or otherwise within: (1) the boundaries of federally owned lands and waters administered by the [NPS]."  Section 1.2(b)

provides, however, that those regulations "do not apply on non-federally owned lands and waters . . . located within National Park System boundaries, except as provided in . . . regulations specifically written to be applicable on such lands and waters."

20. Implementing Section 1.2(b), NPS provided that a number of specific regulations in Chapter 2 would be applicable on "non-federally owned lands . . . located within National Park System boundaries." One such regulation is that protecting wildlife. Section 2.2(a)(1) of those regulations bars the "taking" of wildlife , except where authorized under federal law. "Taking" is defined as "to pursue, hunt, harass, harm, shoot, trap, net, capture, collect, kill, wound, or attempt to do any of the above." 36 C.F.R. § 1.4. Section 2.2(a)(2) bars the "feeding, touching, teasing, frightening or intentional disturbing of wildlife nesting, breeding or other activities." *Id.* § 2.2(a)(2). Invoking the provisions of Section 1.2(b), Section 2.2(g) states that "the regulations contained in this section apply, regardless of land ownership, on all lands and waters within a park area that are under the legislative jurisdiction of the United States." *Id.* § 2.2(g). "Legislative jurisdiction" is defined as "lands and waters under the exclusive or concurrent jurisdiction of the United States." *Id.* § 1.4.

21. Legislative jurisdiction refers to the power of the United States to make rules of conduct on real property. If the United States has "exclusive jurisdiction" as to land, the federal government, but not the state government, may make rules of conduct on that land. If the United States has "concurrent jurisdiction" as to land, either the federal government or the state government may make rules of conduct on that land. *See Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 529-530 (1938). If the federal government adopts valid laws or regulations, however, those laws or regulations preempt any state laws or regulations to the extent of the law of preemption. *Kleppe v. New Mexico*, 426 U.S. 529, 543 (1976).

73681918v4

22.     The United States may acquire legislative jurisdiction as to particular land in a

state by the state's agreement to that jurisdiction.  *Kleppe*, 426 U.S. at 542.   As the Supreme

Court explained,

> The States of the Union and the National Government may make mutually satisfactory
> arrangements as to jurisdiction of territory within their borders and thus in a most
> effective way, cooperatively adjust problems flowing from our dual system of
> government.  Jurisdiction obtained by consent or cession may be qualified by agreement
> or through offer and acceptance or ratification.  It is a matter of arrangement.  These
> arrangements the courts will recognize and respect.

*Collins,* 304 U.S. at 528 (citing, *inter alia*, *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 541

(1885)).  *See also Petersen v. United States,* 191 F.2d 154, 156-57 (9th Cir. 1951).

23.     A state's agreement is generally effectuated by state statute, but such a statute is

not the only means of doing so.  *See United States v. Brown,* 552 F.2d 817, 820-821 (8th Cir.

1977) (finding that State of Minnesota implicitly ceded legislative jurisdiction as to hunting to

the United States over state-owned waters in Voyageurs National Park because "the state did

consent to the creation of the park with the knowledge that the federal government intended to

prohibit hunting with the boundaries of the park."); *United States v. Armstrong,* 186 F.3d 1055,

1061 (8th Cir. 1999) (re-examining the State's role in the creation of Voyageurs National Park

and reaffirming *Brown,* finding that both the State and the United States "understood that if the

park were established the park, including the waters, would be administered by the Secretary of

the Interior in accordance with the general statutory authorities regarding the national park

system."); *United States v. 319.88 Acres of Land,* 498 F. Supp. 763, 769-770 (D. Nev. 1980)

(cession of jurisdiction through action by state agency).

24.     Under Wyoming law, wildlife is not accorded the same level of protection as that

accorded under the NPS Organic Act and NPS regulations thereunder.  Under Wyoming law,

some species of animals may be killed on sight, other species may be killed if causing damage to

property and other species may be hunted if authorized by WGFD.  *See, generally,* Wyo. Stat. Ann. Title 23, Ch. 3.

25.    If Wyoming has explicitly or implicitly agreed to the United States' having at least concurrent jurisdiction over wildlife protection on Grand Teton inholdings, therefore, that wildlife is protected by federal law rather than being subject to killing or harassment under Wyoming law.  And, as to elk, the provisions  of 16 U.S.C. § 673c impose an additional layer of federal control.

## FACTUAL ALLEGATIONS

### Grand Teton: A Crown Jewel of the National Park System

26.    Grand Teton is one of the crown jewels of the National Park System.  It is 45 miles in length north to south, 26 miles in width at its widest point, and encompasses approximately 310,000 acres.  Its natural beauty includes the Teton mountain range, the Snake River to the east of that range, Jackson Lake and Jenny Lake along that river and areas to the east of those water resources which consist of flat land, mesas and hills with streams running through the area.  NPS describes Grand Teton in glowing terms:

> "Rising above a scene rich with extraordinary wildlife, pristine lakes, and alpine terrain, the Teton Range stands monument to the people who fought to protect it.  These are mountains of the imagination.  Mountains that led to the creation of Grand Teton National Park where you can explore over two hundred miles of trails, float the Snake River or enjoy the serenity of this remarkable place."

*Mountains of the Imagination,* National Park Service, http://www.nps.gov/grte/index.htm. (last visited Jan. 15, 2016).

27.    Grand Teton also provides numerous recreational activities for Park visitors who come to view the Park's natural wonders and wildlife, including mountain climbing, hiking and backpacking, skiing, snowshoeing, camping, fishing, wildlife and bird watching, horseback

riding, boating, rafting bicycling and nature and wildlife photography.  Grand Teton had almost 2,800,000 recreational visitors in 2014.  Press Release, National Park Service, Grand Teton National Park Experiences Record Visitation in 2014, http://www.nps.gov/grte/learn/news/news-release-15-02.htm (last visited Jan. 15, 2016).

28.     Grand Teton  is teeming with wildlife, including mule deer, elk, bison, moose, beaver, pronghorn, coyotes, black bears, grizzly bears, wolf packs, mountain lions, and bobcats, among others.  The Park provides both key habitat areas for wildlife  and key migration pathways for migrating herds of wildlife.  The migration routes and habitats are largely located in the open areas east of the Snake River.

**Grand Teton Inholdings**

29.     There are approximately 100 tracts of privately held land inside the boundaries of Grand Teton, totaling almost 1000 acres.  In addition, two tracts of approximately 640 acres each are owned by the State of Wyoming.  Most of the private inholdings and both of the State inholdings lie east of the Snake River.  Allowing Wyoming law relating to wildlife to apply on these inholdings will have a serious detrimental impact on Grand Teton and its wildlife and therefore on Plaintiffs and their members.

30.     One large private inholding is known as "Pinto Ranch."  Approximately 450 acres of that ranch lie within Grand Teton, adjacent to the highway known as U.S. 26 and 287, which is a scenic route used by many visitors to enter the Park.  The ranch is in a major wildlife migration corridor of flat land.  The ranchland is no more than about one mile from the Moran Entrance to the Park, along the road taking visitors to major attractions such as Jackson Lake Lodge, Jackson Lake and river access points for rafting trips.

31.     Another large private inholding is Moose Head Ranch, a dude ranch covering approximately 120 acres.  The ranch sits in a largely flat expanse that is significant foraging area for wildlife.

32.     Other, smaller private inholdings lie along Ditch Creek near the NPS Park headquarters and near visitor facilities in an area heavily frequented by wildlife.

33.     The area in which one 640-acre state-owned  tract sits is called "Antelope Flats," a large expanse of flat land that is a significant grazing and migration area for many species of wildlife.  The second state-owned tract lies near the Gros Ventre River, in another significant migration corridor for wildlife, including pronghorn.  That second tract straddles a road into the Park and is also near the small town of Kelly and near a large campground, the Gros Ventre Campground, which has 372 camping sites.  In addition, that state-owned tract is near the Teton Science School, to which people, particularly young children, come to learn about wildlife.

**NPS's Abdication of Jurisdiction Claimed For 65 Years**

34.     For almost 65 years, from the adoption of the Grand Teton Enabling Act in 1950 until 2014, it was NPS's view that 36 C.F.R. § 2.2 and its predecessors governed the treatment of wildlife everywhere within the boundaries of Grand Teton, including on inholdings.  Moreover, the State of Wyoming did not attempt to supplant federal law in that regard until 2011, when the State of Wyoming argued that it had the power to permit wolves to be shot on Grand Teton inholdings once that species was no longer listed as endangered by the U.S. Fish and Wildlife Service.  Even then, however, NPS contested the State's position, and the State agreed in 2012 that it had no such jurisdiction.

35.     Accordingly, for almost 65 years, NPS and WGFD agreed that the Joint Elk Reduction Program under 16 U.S.C. § 673c applied, not only to federally-owned land, but also to

private and state-owned land within Grand Teton.  No shooting of elk was allowed during that

time anywhere within the Park boundaries, including on inholdings, other than pursuant to that

Program.  In 2014, for example, NPS and WGFD, with the approval of the Governor of

Wyoming and the delegatee of the Secretary of Interior, agreed that special mutually-agreed

limitations and requirements would apply to hunters under that joint program, whether or not

they were on federally-owned land in the Park.  No other elk hunting was permitted anywhere

within the Park's boundaries.

36.      Furthermore, for almost 65 years, NPS and WGFD agreed that, apart from

shooting of elk under the Joint Elk Reduction Program, no hunting or other killing of any other

species was permitted anywhere inside the Park boundaries, including on inholdings.

37.      On information and belief, however, NPS reassessed its position concerning its

jurisdiction in 2014 after a wolf was killed on a private inholding.  On November 11, 2014, NPS

then wrote WGFD, stating: "For many years we assumed that 36 CFR 2.2 applied on private

inholdings within Grand Teton and prohibited the taking of wildlife on those inholdings.  While

NPS continues its interest in ensuring that wildlife management on private inholdings does not

negatively impact park resources, we have concluded that 36 CFR 2.2 does not apply to private

inholdings within Grand Teton."  *See*  Ex. A hereto.  NPS did not provide any explanation as to

why it changed its position concerning the applicability of 36 C.F.R. § 2.2 to Grand Teton

inholdings.

38.      While NPS's November 11, 2014 letter only referred to private inholdings, there

is no legal distinction for purpose of legislative jurisdiction between privately-owned and state

owned land.  In 2015, on information and belief, NPS agreed with WGFD that bison could be

14

hunted on State-owned inholdings.  Accordingly, NPS has abdicated such jurisdiction on all inholdings within Grand Teton.

**NPS's Abdication Results In Significant Changes in the Rules Governing Wildlife Protection and Hunting**

39.     As the result of NPS's abdication of jurisdiction, WGFD moved the border of the area subject to the Joint Elk Reduction Program such that the Pinto Ranch inholding is no longer included in that program but is instead subject to other elk-hunting rules.  On May 6, 2015, NPS agreed to WGFD's removing that inholding from the limitations and requirements of that Program.  *See* Joint Recommendation of the National Park Service and the Wyoming Game and Fish Commission for the Management of Elk Within the Grand Teton National Park for the Year 2015 at 1-3 (attached as Ex. B hereto).  Because of NPS's agreement to the change in the Joint Elk Reduction Program boundaries, hunters no longer need an NPS permit to take elk on the Pinto Ranch.  Hunters are therefore no longer required, in permit applications, to consent to NPS's jurisdiction over that activity.  Moreover, none of the restrictions or requirements apply there to which NPS and WGFD had agreed and imposed on hunters in the Joint Elk Reduction Program.  In addition, the elk hunting season is longer on that inholding under the WGFD regulations now applicable there than the season established under the Joint Elk Reduction Program.

40.     Also as the result of NPS's abdication of jurisdiction under 36 C.F.R. 2.2, other provisions of Wyoming laws and regulations are now applicable to wildlife on Grand Teton inholdings.  Hunting and trapping in Wyoming is regulated under Title 23 of the state's statutes.  Different species are regulated differently under that statute.

a.  Under Wyoming law, some species may be taken at any time or place throughout the state without a state license.  "Take" for this purpose includes hunt, shoot, trap, kill or attempt to do so.  Wyo. Stat. Ann. § 23-1-102(a)(vii).  Wyoming law in this

regard now applies on all inholdings, state or private.  The species which may be taken under this provision are coyote, jackrabbit, porcupine, raccoon, red fox, skunk and stray cats.  Wyo. Stat. Ann.. §§ 23-3-103(a), 23-1-101(a)(viii).  WGFD has the authority to subject certain other species to the same legal provisions.  *Id*. §§ 23-3-103(b) and 23-1-302(a)(ii).

   b.   At any time or place on any Grand Teton inholding, if a beaver, black bear, mountain lion, bobcat, weasel, badger, squirrel or muskrat is causing damage to private property or livestock, it may be immediately taken.  *Id.* § 23-3-115(a).  Special provisions apply to gray wolves in the event they are removed from the endangered species list. *Id.* § 23-3-115(c).

   c.   Other species may be taken under regulations established by WGFD.  WGFD is authorized to fix season and bag limits, regulate hunting licenses, set areas where species may be hunted and otherwise implement the state statute.  *Id.* § 23-1-302(a).  After NPS changed its jurisdictional position, WGFD has allowed hunting on inholdings as follows:

- For deer and elk, WGFD made changes to its regulations that will permit the taking of those species on the Pinto ranch inholding which was previously not permitted under NPS regulations or was jointly controlled by NPS under the Joint Elk Reduction Program.

- For bison, WGFD has allowed hunting on inholdings.  Previously, NPS regulations prohibited taking bison anywhere inside the Park.

- For moose, WGFD made changes that will permit taking of moose on the Pinto Ranch inholding in future seasons, although not for the 2015 season.  Previously, moose on that inholding could not be taken under NPS regulations.

   d.   Wyoming law treats wolves and grizzly bears as "trophy game animal."  *Id.* § 23-1-101(a)(xii).  If either species is delisted as endangered under the Endangered Species Act, WGFD will have the power to permit hunting of that species under Wyo. Stat. Ann. § 302(a)(ii) or (xxix), as the case may be.  On March 11, 2016, the U.S. Fish and Wildlife Service ("FWS") proposed to delist grizzly bears in the Greater Yellowstone Ecosystem, which includes Grand Teton.  81 Fed. Reg. 13174.  The 2012 delisting of wolves in Wyoming has been disputed in litigation, but on February 26, 2016, the U.S. House of Representatives passed H.R. 2406, which would effectuate the delisting without regard to litigation.

**NPS's Reassessment Was Flawed Because Wyoming Had Agreed in 1950 to NPS's Legislative Jurisdiction As to Hunting and Wildlife Protection**

   41.   NPS's 2014 reassessment of its legislative jurisdiction as to wildlife on Grand

Teton inholdings was flawed.  On information and belief, NPS failed in that reassessment to

consider the reason that both NPS and the State of Wyoming had accepted that NPS had such

legislative jurisdiction there for more than 60 years.  That reason is that, in 1950, the federal

government and the state government had agreed that federal law applied to prohibit killing

wildlife on Grand Teton inholdings as well as on federally owned park land.

42.     Prior to 1950, Wyoming had fought the creation of Grand Teton.  The disputed

issues included "the protection of State powers over fish and game, the protection of existing

leases, permits, and licenses, and finally the reimbursement of Teton County for its loss of

revenue."  *See, e.g.,* S. Rep. No. 1938, 81st Cong. 2d Sess. 1-3 (July 6, 1950).  A principal issue

in the dispute was whether the state or federal government would control public hunting in the

Park.  Wyoming wanted exclusive control of such hunting, and the Department of the Interior

refused to allow such hunting in general as contrary to the NPS Organic Act and NPS policy.  In

1949 and 1950, however, Wyoming and the United States reached a historic compromise

agreement.  *See* S. Rep. No. 1938, 81st Cong. 2d Sess. 1-3 (July 6, 1950) (describing the long-

running disputes); *id.* at 3 (the legislation reflects "an agreement between the Federal and State

Governments"); H. Rep. No. 2910, 81st Cong. 2d Sess. 7 (August 11, 1950) ("S. 3409 is the

result of . . . many conferences held between the interested parties.").  Under the compromise

agreement, the Department of the Interior agreed that state-licensed hunters would be permitted

to shoot elk inside the Park under the unique Joint Elk Reduction Program set forth at 16 U.S.C.

§ 673c.  In return, Wyoming gave up its demand for control over hunting of game animals inside

the Park.  As Secretary of the Interior Oscar Chapman, who had been lead negotiator for the

Department, wrote to the WGFD Commissioner and the Wyoming Governor, among others, on

October 4, 1950, only days after the Enabling Act became law, except for that jointly controlled

program, no hunting was allowed of "any animal species at any time or place" within Grand Teton's boundaries.  See Ex C hereto.

43.     The compromise agreement was the result of negotiations during 1949 and 1950 in which the highest officials of the State of Wyoming participated.  The lead negotiator for the State of Wyoming was Wyoming's senior Senator, Joseph C. O'Mahoney.  Other participants in the negotiations included the State's other Senator Lester C. Hunt and representatives of each of Wyoming Governor Arthur G. Crane, WGFD, Teton County and other state interests.  The lead negotiator for the federal government was Oscar Chapman, then Undersecretary of Interior (and later Secretary of Interior).  Other participants were representatives of NPS, of the U.S. Fish and Wildlife Service and of John D. Rockefeller, Jr., who had offered to contribute about 33,000 acres to the new park.

44.     According to contemporaneous records, serious negotiations to resolve the disputed issues began in April 1949.  At an initial meeting of then Undersecretary Chapman, the Wyoming Congressional delegation and others on March 21, 1949, Chapman asked for a written statement of Wyoming's demands.  Accordingly, at the outset of the April negotiations, Wyoming presented a memorandum on behalf of the Governor, WGFD and the County Commissioners of Teton County.  One NPS participant, Conrad L. Wirth, who was later Associate NPS Director, wrote memoranda recording the negotiations.  *See* Ex. D hereto.  One key demand of the State of Wyoming at that time was that, as to all the land east of the Snake River, "Wyoming Game and Fish Commission shall have exclusive dominion and control over hunting wild game."  Ex. D at 3.

45.     Undersecretary Chapman "definitely stated that he could not go along" with that position, which along with one other issue "are the nubbin of the whole matter," according to

Wirth.  Ex. D hereto at 4.  After several days of discussions, however, a tentative compromise was reached on this issue.  The compromise did not give WGFD control of hunting as the State had demanded and did not provide for any hunting in Grand Teton, with one exception. Under the compromise, public hunters were to be allowed to shoot elk in the Park under a program under which the State would play an unprecedented role concerning hunting in a national park. Specifically, an advisory committee would be set up to develop annual and long term plans for "control" of the elk herd.  The committee's recommendations would be submitted to the Interior Secretary and WGFD, which would have the responsibility to issue orders and regulations to implement the hunt recommended by the committee.  *See generally* Ex. D hereto.

46.     The parties continued to exchange and discuss various drafts of bills and bill language.  Wyoming continued to advocate for state control over hunting, but without success. For example, on May 3, 1949, the Governor's representative wrote to Undersecretary Chapman proposing that the land east of the Snake River would become a "Wildlife Management Area" under NPS control "except as to hunting."  May 3, 1949 Letter from Plummer to Chapman, at 1. The State also wanted more control over the makeup of the advisory committee and wanted to make the advisory committee plans binding.  *See* Ex. D; Jan. 3, 1950 Memorandum from Chapman to NPS Director attaching draft bill as approved by Governor's representative and WGFD.  But Chapman would not agree.

47.     On April 12, 1950, Wyoming Senators O'Mahoney and Hunt introduced S. 3409, reflecting the discussions up to that date.  Chapman commented on the bill.  See S. Rep. No. 1938, 81st Cong. 2d Sess. 6 (July 6, 1950).  Describing S. 3409, Chapman wrote that, while "the bill represents what may prove to be the best solution that can be reached" concerning the elk, "I wish to emphasize that not only is any form of hunting contrary to the basic national park

concept, . . . , but that this Department would much prefer to have the elk herd controlled by some other method if a feasible solution could be found." *Id.*

48. On September 14, 1950, the Grand Teton Enabling Act was adopted. Pub. L. No. 787, 81st Cong. 2d Sess. In that Act, Teton County would be allowed tax loss reimbursement, *see* 16 U.S.C. § 406d-3, and existing grazing rights would be continued for the life of the leaseholders and their heirs. *See* 16 U.S.C. § 406d-2. Moreover, in another unique provision, the legislation barred the President from ever again creating a national monument in Wyoming without legislation. *See* Pub. L. No. 787, 81st Cong. 2d Sess. § 1 (Sept. 14, 1950).

49. As to hunting rights, the basic terms of the 1949 compromise were retained. Wyoming was not granted control over hunting, as the State had sought. Instead, public hunting of elk in the Park was permitted under the Joint Elk Reduction Program, reflected in 16 U.S.C. § 673c.

50. After enactment of the legislation, the Department of the Interior and the State of Wyoming had to resolve the issue of licenses that the State had already granted for the hunting of elk, moose, antlered deer and black bear in some parts of the new park for the hunting season that had already begun. Governor Crane asked NPS not to enforce its regulations for that season. Then-Secretary Chapman initially wrote that, if "all portions of [Grand Teton]" could not be closed to hunting upon public notice, NPS would suspend its regulation, but only for elk. A flurry of telegrams followed. The discussion was not limited to federal land, but to "all hunting within the exterior boundaries of the newly created" Grand Teton. Sept. 20, 1950 Letter from WGFD Commissioner to Chapman.

51. Chapman then wrote on October 4, 1950 to WGFD, with copies to Governor Crane, Senators O'Mahoney and Hunt and Congressman Barrett. Ex. C hereto. Chapman

agreed to suspend NPS regulations for the 1950 season as to all species.  But he asserted that that

action was exceptional.  As to the protection of "park wildlife," he stated:

> The act which established the new Grand Teton National Park does
> not allow the hunting of any animal species at any time or place
> within the boundaries, except elk within certain specified portions
> of the area and then only after following certain preliminary
> procedures as described in Section 6 [16 U.S.C. § 673c].

52.     Secretary Chapman's October 4, 1950 letter accordingly indicated that federal

laws and regulations would thereafter govern hunting and protection of wildlife everywhere

within Grand Teton, including on inholdings.

**NPS Erroneously Based Its Reassessment on its Misreading of a Later Wyoming Cession
Statute**

53.     On information and belief, NPS based its 2014 reassessment of legislative

jurisdiction on its reading of a 1977 Wyoming statute.  *See* Wyo. Stat. Ann. § 5-1-108(a).  In that

statute, Wyoming ceded concurrent jurisdiction to the United States over crimes and offenses

under state laws "over and within all territory dedicated to national park, monument, historic site

or public recreational purposes included in tracts of land in Wyoming designated as . . . Grand

Teton National Park."  *Id.*  On information and belief, NPS's conclusion that it lacked legislative

jurisdiction is based on its view that Grand Teton inholdings are not covered by this statute

because they are not "dedicated to national park . . . purposes."  But that statute is not the only

source of NPS's legislative jurisdiction to protect Grand Teton's wildlife on such inholdings, as

demonstrated above.  In any event, NPS has misread the Wyoming statute, which does not cover

only land "dedicated to national park . . . purposes."  That statute expressly applies to areas "over

and within" land so dedicated.  Wyo. Stat. Ann. § 5-1-108(a).  Grand Teton inholdings are

certainly "within" the surrounding federal land dedicated to national park purposes.

21

**NPS Erroneously Assumed That If It Lacked Legislative Jurisdiction, NPS Also Had No Authority under 16 U.S.C. § 673c To Control Elk Hunting On Inholdings**

54.     On information and belief, NPS did not consider whether 16 U.S.C. § 673c

imposed a separate legal restriction on elk hunting on inholdings apart from the provisions of 36

C.F.R. § 2.2.  Accordingly, NPS extended its conclusion that it lacked legislative jurisdiction so

to implicate the Joint Elk Reduction Program as well as the applicability of that regulation.  But

the statute authorizing the Joint Elk Reduction Program stands on separate legal ground, and

NPS's authority thereunder does not depend on legislative jurisdiction.  Nevertheless, NPS

agreed with WGFD to remove the Pinto Ranch inholding from that Program while elk hunting

would nevertheless be permitted there.  *See* Ex. B hereto.

**Plaintiffs Unsuccessfully Urge NPS to Revoke its New No-Legislative-Jurisdiction Position**

55.     In July, 2015, Plaintiffs requested that NPS revoke its new position regarding the

applicability of Section 2.2 to Grand Teton inholdings and reassert NPS's longstanding prior

position that Section 2.2 protects wildlife there.  Among other things, Plaintiffs submitted to NPS

copies of the contemporaneous documents cited and referred to in paragraphs 42-52 above,

demonstrating that Wyoming had agreed that federal laws and regulations governing wildlife and

hunting on those inholdings apply rather than Wyoming law.  However, NPS declined to

reconsider its position.

**Final Agency Action**

56.     NPS's November 11, 2014 letter to WGFD attached as Exhibit A hereto

constitutes final agency action.  That letter was the "consummation of the agency's

decisionmaking process" on NPS's determination as to whether it has legislative jurisdiction

22

over hunting and other taking of wildlife on Grand Teton inholdings.  *See Bennett v. Spear*, 520

U.S. 154, 177-78 (1997).  NPS has stood behind that November 11, 2014 letter and has not

withdrawn that letter in the face of Plaintiffs' request to do so.  Legal consequences have flown

and will flow from that letter, *see id.,* in that Wyoming hunting laws and rules allowing the

taking of wildlife now apply to Grand Teton inholdings, while previously NPS rules banning

hunting and taking of wildlife applied there.  As a result of that letter, among other things, bison

have been killed on Park inholdings that would have been prohibited under NPS regulations.  In

addition, WGFD revised its regulations so as to allow elk to be hunted on Pinto Ranch without

the limitations and requirements of the Joint Elk Reduction Program and so as to allow deer to be

hunted on that ranch, as described in paragraphs 39 and 40, above.

57.     On May 6, 2015, NPS signed the Joint Recommendation of the National Park

Service and the Wyoming Game and Fish Commission for the Management of Elk Within the

Grand Teton National Park for the Year 2015 (attached as Exhibit B hereto).  That NPS action

constituted final agency action agreeing with WGFD's change in the boundary for the Joint Elk

Reduction Program so as to exclude Pinto Ranch from its requirements.  The boundaries of the

Joint Elk Reduction program remain in effect unless and until changed for future years.


**FIRST CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. §  706-- Contrary to law by Abdication of**
**Legislative Jurisdiction over Hunting and Wildlife Protection in Grand Teton Inholdings**

58.     The Administrative Procedure Act, 5 U.S.C. § 706, authorizes federal courts to set

aside agency actions that are contrary to law.  Both that Act and 28 U.S.C. §§ 2201-02 authorize

the Court to issue declaratory judgments.

59.     Plaintiffs incorporate Paragraphs 1 - 57 above as if repeated here.

73681918v4

60.     36 C.F.R. § 2.2 applies to all lands where the United States has legislative jurisdiction, regardless of land ownership.  For 65 years, NPS applied that regulation and its predecessors to prohibit hunting anywhere within the boundaries of Great Teton and otherwise to protect wildlife there, except as mandated by Congress.

61.     The United States has legislative jurisdiction as to hunting and wildlife protection within inholdings inside Grand Teton.  Such legislative jurisdiction may arise from explicit or implicit cession from the State of Wyoming.  *See Brown,* 552 F.2d at 820-821 (finding that State of Minnesota implicitly ceded legislative jurisdiction as to hunting to the United States over Voyageurs National Park, including on non-federal portions, because "the state did consent to the creation of the park with the knowledge that the federal government intended to prohibit hunting with the boundaries of the park."); *United States v. Armstrong,* 186 F.3d 1055, 1059-1061 (8th Cir. 1999) (re-examining the state's role in the creation of Voyageurs National Park and reaffirming *Brown,* finding that both the State and the United States "understood that if the park were established, the park, including the [state-owned] waters, would be administered by the Secretary of the Interior in accordance with the general statutory authorities regarding the national park system."); *319.88 Acres of Land*, 498 F. Supp. at 769-770 (D. Nev. 1980) (cession of jurisdiction through action by state agency).

62.     In 1949-1950, the State of Wyoming implicitly ceded concurrent jurisdiction over hunting and wildlife protection in Grand Teton and its inholdings by agreeing to a historic compromise of disputes relating to the creation of the modern Grand Teton National Park and by supporting such creation knowing that hunting would not be permitted anywhere within the Park, including on its inholdings, except hunting permitted under the Joint Elk Reduction Program

under 16 U.S.C. § 673c.  Under that compromise agreement, the State obtained and has enjoyed and still enjoys the benefits of significant concessions made by the federal government.

63.     The State of Wyoming further ceded concurrent legislative jurisdiction  in Wyo. Stat. Ann. § 5-1-108.

64.     On November 11, 2014, NPS, however, abdicated its authority and responsibility for wildlife protection on Grand Teton inholdings by turning over to the State of Wyoming complete control over hunting and wildlife protection on Grand Teton inholdings.  By doing so, NPS acted not in accordance with law because NPS does have legislative jurisdiction over hunting and protection of wildlife on those inholdings and 36 C.F.R. § 2.2 applies there.

65.     Congress mandated that NPS protect and preserve the wildlife in the National Park System and did not authorize NPS to abandon its power to do so where that power exists. Congress to the contrary mandated that NPS's management of the National Park System "shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress."  54 U.S.C. § 100101(b)(2).  The only respect in which Congress provided that hunting could be allowed anywhere in Grand Teton was in 16 U.S.C. § 673c, authorizing NPS to allow elk shooting under specific procedures.

66.     On May 6, 2015, NPS abdicated its jurisdiction over the shooting of elk on the Pinto Ranch inholding by agreeing that WGFD could change the boundaries of the Joint Elk Reduction Program to exclude that inholding but to permit elk to be shot there outside the limitations and requirements of that Program.

67.     NPS's abandonment of its authority and responsibility for wildlife hunting and protection on Grand Teton inholdings has resulted in will result in the future in the killing of wildlife on such inholdings that would have been prohibited by NPS regulations and, as to elk, would have been under NPS control by the Joint Elk Reduction Program's requirements under 16 U.S.C. § 673c.  The experience of visitors, including Plaintiffs' members, has been and will be significantly and adversely impacted by such killings and by NPS's abdication of authority.

68.     NPS violated the Organic Act, the Grand Teton Enabling Act and 36 C.F.R. § 2.2 by abdicating its authority over the hunting and protection of wildlife on Garand Teton inholdings.

**SECOND CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. §  706--Acts Contrary to Law by Violating**
**16 U.S.C. § 673c**

69.     The Administrative Procedure Act, 5 U.S.C. § 706, authorizes federal courts to set aside agency actions that are contrary to law.  Both that Act and 28 U.S.C. §§ 2201-02 authorize the Court to issue declaratory judgments.

70.     Plaintiffs incorporate Paragraphs 1 - 68 above as if repeated fully here.

71.     Congress mandated that NPS protect and preserve the wildlife in the National Park System and did not authorize NPS to abandon its power to do so where that power exists. Congress to the contrary mandated that NPS's management of the National Park System "shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as  directly and specifically provided by Congress."  54 U.S.C. § 100101(b)(2).

26

72.     The only respect in which Congress provided directly and specifically that wildlife could be hunted anywhere in Grand Teton was in 16 U.S.C. § 673c, authorizing NPS to allow elk shooting under specific procedures.  Congress adopted that statute under its powers under the Property Clause of the U.S. Constitution, which authorizes Congress to make all needful rules and regulations to protect federal property, even where those rules and regulations apply to private property.  *See, e.g., Kleppe*, 426 U.S. at 546-547; *Minnesota v Block*, 660 F. 2d 1240, 1248-1249 (8th Cir. 1981).  To the extent State laws or regulations conflict with or undermine the effectiveness of 16 U.S.C. § 673c, those State laws or regulations are preempted. *Kleppe*, 426 U.S. at 543.

73.     At least as to elk, the only shooting that may be allowed inside the  boundaries of Grand Teton is shooting consistent with the procedures and requirements of the Joint Elk Reduction Program, including by obtaining NPS's agreement thereto.  On information and belief, NPS and WGFD conducted that Program for 65 years by including both federally-owned land and non-federally owned land inside the Park under that Program.

74.     On May 6, 2015, however, NPS violated 16 U.S.C. § 673c and abdicated its authority and responsibility thereunder by agreeing that WGFD could change the boundaries of the Joint Elk Reduction Program to exclude the 450-acre Pinto Ranch inholding but to permit elk to be shot there outside the limitations and requirements of that Program.

75.     NPS violated the Organic Act and 16 U.S.C. § 673c by agreeing to WGFD's changing the boundaries within which the Joint Elk Reduction Program governs elk shooting to exclude the Pinto Ranch inholding from the limitations and requirements of that Program but instead to make hunting of elk on that inholding subject to a different and less restrictive regime.

27

NPS also thereby violated those statutes by abdicating its authority and responsibility to control

elk hunting anywhere within the Park, including on inholdings.


### THIRD CLAIM FOR RELIEF
**Administrative Procedure Act, 5 U.S.C. §  706--Arbitrary and Capricious Acts and Omissions by Failing to Have Considered The Events of 1949-1950 In Which Wyoming Ceded Concurrent Legislative Jurisdiction Over Hunting and Wildlife Protection inside Grand Teton Inholdings**

76.     The Administrative Procedure Act, 5 U.S.C. § 706, authorizes federal courts to set

aside agency actions that are arbitrary and capricious.

77.     Plaintiffs incorporate Paragraphs 1 - 75 as if repeated fully here.

78.     On information and belief, when NPS reassessed its legislative jurisdiction in

2014 over hunting and wildlife protection in Grand Teton inholdings, NPS failed to consider the

critical facts described in paragraphs 42 to 52 above and to assess the relevance of those facts in

that reassessment.

79.     Those facts were either known to or readily available to NPS, in part because the

key documents are located in NPS's and Department of the Interior's own records at the National

Archives and Records Administration.  The court decisions in *United States v. Brown* and *United

States v. Armstrong*, discussed above, were known to or should have been known to NPS

because NPS was directly involved in those litigations.

80.     Defendants' failure to consider the 1949-1950 negotiations and agreement and the

implications of those negotiations and agreement for conferring legislative jurisdiction over

hunting and wildlife protection in Grand Teton inholdings was arbitrary and capricious and an

abuse of discretion.

81.     In addition, federal agencies are required to provide a "reasoned analysis" when they change their positions.  *See Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57 (1983).  Defendants failed to provide any explanation for their decision to change NPS's longstanding position that 36 C.F.R. § 2.2 applied to Grand Teton inholdings. Defendants' failure to provide a reasoned explanation of its decision to change its position on the applicability of 36. C.F.R. § 2.2 to Grand Teton inholdings was arbitrary and capricious.

## PRAYER FOR RELIEF

1.      Declare that NPS does have legislative jurisdiction as to hunting and wildlife protection as to Grand Teton inholdings and that 36 C.F.R. § 2.2 accordingly does apply there.

2.      Declare that 16 U.S.C. § 673c is the exclusive authorization for shooting of elk anywhere inside Grand Teton's boundaries and that any State rules or laws inconsistent with that statute are preempted and invalid.

3.      Set aside and vacate the NPS November 11, 2014 letter to WGFD as contrary to law and the result of arbitrary and capricious decision-making.

4.      Set aside and vacate as contrary to 16 U.S.C. § 673c and as arbitrary and capricious NPS's May 6, 2015 agreement to WGFD's amendment to the boundaries of the Joint Elk Reduction Program because that amendment moves the Pinto Ranch inholding out of that Program and allows elk shooting on that inholding under solely State control.

5.      Enjoin any wildlife management activities -- including hunting, shooting or trapping -- anywhere inside Grand Teton, including on inholdings, that are not consistent with 36 C.F.R. § 2.2.

6.      Enjoin any elk shooting on the Pinto Ranch inholding or any other inholding that is not authorized pursuant to and in compliance with 16 U.S.C. § 673c.

7.      Award Plaintiffs reasonable attorneys fees and costs.

8.      Award Plaintiffs such other relief as the court may deem appropriate.


Respectfully submitted this 23rd day of March, 2016


/s/ Robert D. Rosenbaum
Robert D. Rosenbaum (D.C. Bar No. 90498)
Arnold & Porter LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
robert.rosenbaum@aporter.com
202-942-5000
202-942-5999 (fax)

*Attorney for Plaintiffs National Parks Conservation Association and Greater Yellowstone Coalition*